IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


NANCY N. THOMAS,                    )
                                    )
v.                                  )        No. 3:07-0247
                                    )
MICHAEL J. ASTRUE,                  )
        Commissioner of Social Security    )


To: The Honorable Thomas A. Wiseman, Jr., Senior District Judge


**REPORT AND RECOMMENDATION**


        The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the

final decision of the Secretary of Health and Human Services denying Disability Insurance Benefits

("DIB") under the Social Security Act (the "Act").

        Upon review of the Administrative Record as a whole, the Court finds that the

Commissioner's determination that the plaintiff could perform her past relevant work as a dietician

during the relevant time period is supported by substantial evidence in the record as required by

42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the record (Docket Entry No. 13)

should be denied.


**I. INTRODUCTION**

        The plaintiff filed an application for DIB on June 20, 2001, alleging disability due to

depression, fibromyalgia, fatigue, irritable bowel syndrome ("IBS"), hypothyroidism, sleep disorder,

1

fibrocystic breast disease, temporomandibular joint symptoms ("TMJ"), and chronic sinusitis with a date of onset on June 10, 2000. (Tr. 73, 139.) The plaintiff's application for DIB was denied initially and upon reconsideration. (Tr. 36, 42.) A hearing was held before Administrative Law Judge ("ALJ") Mack Cherry on December 3, 2003. (Tr. 475-503.) The ALJ delivered an unfavorable decision on July 26, 2004 (Tr. 18-29), and the plaintiff petitioned for a review of that decision before the Appeals Council. (Tr. 11-12.) The Appeals Council denied the plaintiff's request for review of that decision on December 29, 2006 (Tr. 6), and the ALJ's decision became the final decision of the Commissioner.

## II. BACKGROUND

The plaintiff was born on December 27, 1954, and was 45 years old as of June 10, 2000, her alleged onset date. (Tr. 32, 73.) Her highest level of education is a bachelor's degree. (Tr. 145, 174.) The plaintiff's past jobs included work as a dietician and as an account manager/representative for a health-care corporation in Middle Tennessee. (Tr. 166-68.)

### A. Chronological Background: Procedural Developments and Medical Records

The plaintiff's medical records date back several years before her alleged onset date and indicate that she was diagnosed with IBS, chronic sinusitis, endometriosis, fibromyalgia, hypothyroidism, sleeplessness, and depression. (Tr. 205-49.) On March 19, 1998, the plaintiff began physiotherapy treatment for myofascial pain.[1] (Tr. 273.) After nearly two years of physical therapy

---

[1] Myofascial pain is pain "pertaining to or involving the fascia surrounding and associated with muscle tissue." Dorland's Illustrated Medical Dictionary 1213 (30th ed. 2003) ("Dorland's"). The term "fascia" refers to "a sheet or band of fibrous tissue such as lies deep to the skin or forms

2

(Tr. 250-73), the plaintiff's overall condition improved but there were "minor setbacks." (Tr. 251.) The plaintiff discontinued her physical therapy treatment nearly one year before her alleged onset date. (Tr. 250.) On October 15, 1999, psychiatrist Dr. Stephen Nyquist diagnosed the plaintiff with anxiety and depression. (Tr. 325.) Dr. Nyquist treated the plaintiff until December 15, 2000, and repeatedly described her mood as "stable."[2] (Tr. 315-16, 321-22.)

The plaintiff presented to her primary-care physician, Dr. Sally Killian, on October 22, 1999, and was diagnosed with major depression, hypothyroidism, infertility, TMJ, IBS, and osteopenia. (Tr. 385.) The plaintiff returned to Dr. Killian on February 21, 2000, and she noted that the plaintiff's depression had increased. (Tr. 383.) Dr. Killian recommended that the plaintiff ask her psychiatrist to help her "address the increased depression." *Id.* On April 3, 2000, Dr. Killian opined that plaintiff's depression had improved with the help of counseling and that she was "well groomed, more confident, able to make good contact, and exhibit[ed] only mild agitation when discussing some of these issues." (Tr. 380.) The plaintiff returned to Dr. Killian on October 2, 2000, and reported she had quit working "because she no longer felt able to manage her job responsibilities." (Tr. 375.) The plaintiff reported that her depression improved since taking Lorazepam and that she was sleeping well. *Id.* Dr. Killian determined that the plaintiff had symptoms consistent with fibromyalgia, chronic sinusitis, osteopenia, and depression, but also noted that a recently conducted thyroid function test on the plaintiff revealed normal results. *Id.*

---

an investment for muscles and various other organs of the body." *Id.* at 674.

[2] Every attempt to decipher Dr. Nyquist's support for his findings was undertaken; however, several handwritten sections were simply illegible.

3

On September 17, 2001,[3] the plaintiff returned to Dr. Killian with complaints of pain in her left breast. (Tr. 366.) Dr. Killian diagnosed the plaintiff with costochondritis[4] and prescribed Celebrex. *Id.* Dr. Killian examined the plaintiff on October 9, 2001, and diagnosed her with fibromyalgia, hypothyroidism, and IBS. (Tr. 361.) The plaintiff's next examination was not until November 20, 2002, and "[h]er most prominent symptom continue[d] to be fatigue." (Tr. 433.) The plaintiff believed she had "returned from 20% to 60% of normal," but complained that her pain and fatigue increase when she tries to work. *Id.* Dr. Killian diagnosed the plaintiff with "fibromyalgia with prominent symptoms of fatigue and disturbed sleep," IBS, fibrocystic breast disease, hypothyroidism, "[d]epression, which appears to have improved," and TMJ. (Tr. 434.) The plaintiff's treatment plan included the potential of changing medication, blood testing, and scheduling a mammogram. *Id.*

Dr. Killian completed a Medical Source Statement of Ability to Do Work-Related Activities ("Medical Source Statement") on July 13, 2003, and found that the plaintiff could lift/carry 50 pounds occasionally and 20 pounds frequently, and in an eight hour workday stand/walk at least two hours and sit about six hours. (Tr. 437-40.) Dr. Killian concluded that the plaintiff could occasionally climb and frequently balance; should never kneel, crouch, crawl or stoop; and should have limited exposure to temperature extremes since "[e]xtreme cold will exacerbate [her] muscle

---

[3] Plaintiff had a follow-up visit on December 5, 2000, another visit for a yeast infection on March 13, 2001, and a mammogram on May 30, 2001. (Tr. 367-70.)

[4] According to mayoclinic.com, costochondritis is an inflammation of the cartilage that connects a rib to the breastbone (sternum).

4

pain and stiffness." (Tr. 438.) Dr. Killian did not assign the plaintiff any manipulative or visual/communicative limitations. (Tr. 439.)

On January 4, 2001, the plaintiff presented to Dr. Regina Gilliland with pain and fatigue resulting from fibromyalgia.[5] (Tr. 413-14.) The plaintiff complained of daily depression, a lack of feelings of joy or excitement, and a loss of hope and joy. (Tr. 414.) The plaintiff reported that she did water aerobics, took spinning classes, and used "some weight machines." (Tr. 413.) Treatment notes reveal that over the course of several appointments, Dr. Gilliland educated plaintiff on diet, sleep, and vitamins. (Tr. 409-11.) In March and May of 2001, the plaintiff reported that her sinus condition, depression, and sleeplessness had improved, and Dr. Gilliland noted that plaintiff was "exercising consistently." *Id.* On October 11, 2001, plaintiff complained that "sleep was still not great," but that she was sleeping through the night two nights per week and only waking up once a night on the other five nights. (Tr. 408.)

On October 18, 2001, Dr. Gilliland completed a physical medical opinion form and found that in an eight hour day the plaintiff could sit for one to two hours and only for 20 to 30 minutes at a time, and stand or walk for one hour and only for 10 to 20 minutes at a time. (Tr. 405.) She determined that the plaintiff could lift/carry up to 10 pounds infrequently and up to five pounds occasionally, but should never lift/carry anything over 10 pounds. *Id.* Dr. Gilliland opined that the plaintiff should never stand on a hard surface, but could infrequently bend at her waist, reach above her shoulders, and use her hand for fine manipulation. *Id.* She concluded that the plaintiff required

---

[5] The plaintiff describes Dr. Gilliland as a specialist in treating fibromyalgia. Docket Entry No. 14, at 2. Her Curriculum Vitae reflects that her speciality is physical medicine and rehabilitation, that she is board certified by the American Board of Physical Medicine and Rehabilitation, and that she has published an article on fibromyalgia. (Tr. 188-89.)

30 minutes to one hour of bed rest during a normal workday, had reasonable subjective complaints of pain, and suffered from severe pain. (Tr. 406.) Dr. Gilliland also noted that the plaintiff's pain or medication would likely "cause lapses in concentration or memory on a regular basis," and that "flare-ups" of her condition would cause concentration and memory problems that could last "for days or months." *Id.*

On September 13, 2001, the plaintiff completed questionnaires regarding her activities of daily living, pain, and fatigue. (Tr. 152, 165.) The plaintiff indicated that she had been on anti-depressants for four years, had physical problems that contributed to the frustration "of her change of lifestyle," and suffered from an inability to concentrate and memory loss. (Tr. 152-53.) She reported that she leaves her home "approx. 5-6 times per week;" is able to drive; and goes to the grocery store, church, and YMCA "to walk or ride the bike per doctor's orders." (Tr. 154.) The plaintiff stated that she tries to go to a friend's home once a week for dinner, attends Bible study once a month, and has a house cleaner who "does most of the cleaning." (Tr. 154-55.)

The plaintiff also indicated that her back and jaw pain spreads to her shoulders, neck, and lower back and that the pain "never goes away - intensity may change but it never goes away." (Tr. 159.) She reported that her pain limits her ability to go on bike rides with her husband, work in the yard, go shopping, and participate in social events and church functions. (Tr. 161.) The plaintiff noted that she has to pace herself when completing chores and that she can only be on her feet "ten-15 minutes at the most" before needing to rest. (Tr. 163-64.)

The plaintiff presented to Dr. Robert LaGrone on September 20, 2001, and he found that she had "diffuse muscle tenderness" caused by fibromyalgia and the possibility of mild sleep apnea. (Tr. 199-200.) On October 31, 2001, Tennessee Disability Determination Services ("DDS")

6

evaluator Dr. James N. Moore conducted a physical residual functional capacity ("RFC") and found that the plaintiff could lift/carry up to 25 pounds frequently and up to 50 pounds occasionally, stand/walk and sit about six hours in an eight hour work day, and push/pull without limitation. (Tr. 334-35.) Dr. Moore opined that the plaintiff "alleges fibromyalgia - has rigorous exercise program [and] bikes; fatigue - not shown by MER to be marked; [and] IBS–treatable." (Tr. 335.) He also stated that her thyroid was "amenable to replacement therapy," that she was currently on sleep medication for her sleep disorder, that her fibrocystic breast changes were non-severe, that she wore a mouth guard for her TMJ, and that her sinunistis was treatable. (Tr. 335-36.) Dr. Moore indicated that the treating physician's evaluation of the plaintiff's physical restrictions was "too restrictive for objective data." (Tr. 340.)

On October 8, 2001, consultative examiner Dr. Bruce Davis reviewed the plaintiff's medical symptoms and conducted a physical examination that revealed "mild generalized (extremities, upper back, upper chest) focal trigger tenderness." (Tr. 326-27.) He diagnosed the plaintiff with IBS, hypothyroidism, "fibrocystic breast changes," and "[f]ibromyalgia with musculoskeletal, fatigue, and depression symptoms." (Tr. 328.) Dr. Davis opined the plaintiff's medical problems were chronic, had not improved with treatment, and required regular medical/psychological treatment. *Id.* He indicated that she could lift/carry twenty pounds occasionally and ten pounds frequently. *Id.* Dr. Davis also determined that in an eight hour workday the plaintiff could stand/walk for six hours and sit for eight hours, but was limited in her ability to squat. *Id.*

On October 16, 2001, consultative psychologist Dr. Deborah Doineau conducted a psychological evaluation of the plaintiff and found that she suffered from major depression (mild to moderate), but had good response to treatment. (Tr. 329, 333.) The plaintiff reported that she had

no learning disabilities and worked twenty years as a dietician until she was placed on short-term disability. (Tr. 331.) She complained of feeling "mildly depressed off and on,"and described her depressive moods as "flare-ups." *Id.*

The plaintiff described her activities of daily living to Dr. Doineau, which included reading her Bible, sitting on her patio, reading the newspaper, getting dressed, and cooking simple meals in the oven. (Tr. 332.) She stated that she has more energy in the afternoon, "gets clothes out of the dryer," is able to load the dishwasher, and "picks up around the house." *Id.* The plaintiff reported that she works out at the YMCA for exercise about three or four times per week, attends Bible study once a month and church twice a month, does most of her own grocery shopping, and drives herself to appointments. (Tr. 332-33.) The plaintiff described two days out of two weeks as being "good days," one or two days out of two weeks as being "bad days," and "lots of average days which are not particularly good or particularly bad." (Tr. 333.) Dr. Doineau concluded that the plaintiff was capable of understanding instructions and using public transportation or adapting, and that she did not appear to be significantly impaired. (Tr. 333.)

On November 29, 2001, a DDS consultative physician[6] completed a Psychiatric Review Technique Form ("PRTF") on the plaintiff (Tr. 342-55) and found that she had mild restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. (Tr. 352.) The consultative physician indicated that the plaintiff had no episodes of decompensation; noted that the plaintiff had received outpatient treatment in November 2000 for depression, but none since that time; and listed the plaintiff's activities of daily

---

[6] The doctor's name is illegible.

living as "chores, church, exercise class, cooks, read, visits others, [and] shops." (Tr. 352, 354.) The consultative physician concluded that the plaintiff's "mental limits are non severe." (Tr. 354.)

On March 21, 2002, a vocational assessment of the plaintiff determined that she could perform medium work and thus could perform her past work as a clinical dietician and hospital insurance representative. (Tr. 181-82.) Chiropractor Dr. James Derbes examined the plaintiff on May 24, 2002, for complaints of neck pain. (Tr. 398-99.) The plaintiff made six additional visits to Dr. Derbes between May 25, 2002 and June 12, 2002, complaining of decreased energy and fatigue. (Tr. 394.) Dr. Derbes' treatment notes from September 30, 2002, indicate that the plaintiff was "doing okay, [taking a] pilates class 2-3x/wk," and had increased endurance. *Id.* He also noted that "she will call [her attorney] to say that I do not have any current tx [treatment] to base any opinion on." *Id.*

A DDS physician completed another physical RFC on November 20, 2002, and concluded that the plaintiff had no limitations. (Tr. 4, 418-21.) The examiner noted that "Dr. Gilliland's MA [medical assessment] is too restrictive in view of objective medical evidence." (Tr. 419.)

Dr. Gilliland examined the plaintiff again on August 27, 2003, and indicated that all laboratory tests conducted in January or February 2003 were normal. (Tr. 460.) The plaintiff reported increases in pain, anxiety, and depression. *Id.* She revealed that she still exercised three to four times per week, stretched five times per week, and that even though her sleep was "ok," she woke between 2:30 and 3:00 a.m. each morning. *Id.* The plaintiff complained that she was "having trouble with walking long distances and up/down stairs." *Id.* Dr. Gilliland diagnosed the plaintiff with fibromyalgia, chronic pain, sleep disorder, plantar fasciitis, [holdover] depression and anxiety,

9

postural abnormalities, and myofascial pain. *Id.* Dr. Gilliland prescribed Zyprexa[7] for the plaintiff and encouraged her to continue exercising. *Id.*

Dr. Gilliland completed a second physical medical opinion form on October 7, 2003, and opined that in an eight hour day the plaintiff could sit for one to two hours and only for 20 minutes at a time, and stand/walk for one to two hours and only for 10 to 20 minutes at a time. (Tr. 461.) She determined that plaintiff could lift/carry up to 20 pounds infrequently and up to five pounds occasionally, but should never lift/carry anything over 20 pounds. *Id.* Dr. Gilliland opined that the plaintiff could occasionally bend at her waist and infrequently reach above her shoulders and use her hand for fine manipulation, but should never stand on a hard surface. *Id.* She concluded that the plaintiff required 10 to 40 minutes of bed rest twice a day during a normal workday, had reasonable subjective complaints of pain, and suffered from severe pain. (Tr. 462.) Dr. Gilliland stated that the plaintiff's difficulty with maintaining stamina and endurance would require her to take additional breaks during the workday, but that the extent of her problems "varies according to pain and [patient symptoms]." *Id.* She noted that the plaintiff should avoid "heat, cold, humidity, heights, dust, perfumes, [and] changes in temperature;" would be unable to attend work on a regular basis; and could be "reasonably medically expected" to miss six or more days of work per month. (Tr. 462-463.)

---

[7] According to WebMD.com, Zyprexa "is used to treat certain mental/mood conditions (schizophrenia, bipolar mania). It works by helping to restore the balance of certain natural chemicals in the brain (neurotransmitters). Some of the benefits of continued use of this medication include feeling less nervous, better concentration, and reduced episodes of hallucinations."

10

**B. Hearing Testimony: The Plaintiff and a Vocational Expert**

At the hearing before the ALJ (Tr. 475-503), the plaintiff was represented by counsel, and the plaintiff and Gordon Doss, a Vocational Expert ("VE"), testified. (Tr. 476-77.)

The plaintiff testified that she had previously worked as a marketing representative and dietician. (Tr. 481.) Her duties as a dietician included "traveling in a car, walking, carrying materials, public speaking, and teaching." *Id.* She indicated that she lifted files weighing "anywhere from five to ten pounds." (Tr. 481-82.) The plaintiff explained that she was unable to work because of "[p]ain, fatigue, difficulty concentrating, focusing, sometimes even difficult to carry on a phone conversation [because she was] too fatigued to do that." (Tr. 483.) The plaintiff's fibromyalgia caused pain to extend "throughout [her] body, legs, started out in the shoulders and back, but it's progressed to go all the way down to [her] legs." *Id.*

The plaintiff testified that she alleviates the pain by taking Ibuprofen and warm showers, using the whirlpool at the YMCA, or getting massages. (Tr. 484.) She stated that she exercises three or four times per week, and her exercise routine includes walking or water exercises and stretching. (Tr. 484-85.) The plaintiff explained that due to her pain she has to lie down twice a day for a total of four hours. (Tr. 485.) She also related that she could do eight to ten repetitions of three pound weights and lift five pounds, but doing so would be painful and she would "feel the consequences the next day." (Tr. 486.)

The plaintiff stated that her condition has resulted in a poorer quality of life and that on her worst days she is unable to take a shower and dress. (Tr. 489.) The plaintiff testified that her depression had worsened, but that she had not received treatment for depression because she believed that prior treatment had been ineffective. (Tr. 492-93.) She related that she had visited

11

Florida twice in the past nine months, once by car and once by plane, to supervise the construction of her home. (Tr. 497.) The plaintiff testified that her volunteer work at the YMCA consisted of "act[ing] as a consultant to the employees and some of the community volunteers." *Id.*

The VE testified that the plaintiff's previous jobs as a dietician and marketing or customer service representative would be considered light and skilled. (Tr. 499.) The ALJ asked the VE to consider a 48 year old person with a college education who had a background experience similar to that of the plaintiff and

> is limited to light work, and walk or stand for six hours out of an eight hour day, needs a sit/stand option, no ladders, ropes, or scaffolds, can only occasionally do the postural activities of climb stairs, ramps, balance, stoop, bend, kneel, or crouch, and no crawling, should avoid extremes in temperature, dampness, wetness, and humidity, in deference to her medication, hazardous machinery, and unprotected heights. And also let us factor in a moderate deficiency of concentration, persistence, and pace in deference to pain and discomfort.

(Tr. 500.) The VE concluded that the plaintiff would be unable to perform her most recent marketing job, but would be able to perform her past work as a dietician. (Tr. 499-500.) He elaborated that even if plaintiff were limited to sedentary work she would still be able to perform her past work as a dietician, but to a "minimal degree." *Id.* The VE also testified that a person limited to sedentary work could be employed as a receptionist, telephone order clerk, or telemarketer. (Tr. 501.)

### III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on July 26, 2004. (Tr. 18-29.) Based on the record, the ALJ made the following findings:

1.      The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.      The claimant has not engaged in substantial gainful activity since her alleged onset date, June 10, 2000.

3.      The claimant has severe impairments as defined in the Social Security Regulations. [20 CFR § 404.1520(c)]. The claimant's severe impairments are fibromyalgia, osteoarthritis, and a depressive disorder.

4.      The claimant's severe impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.      The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.      On her alleged onset date, June 10, 2000, the claimant was 45 years old which is defined as a younger individual. She is currently 49 years old. (20 CFR § 404.1563).

7.      The claimant has a college education. (20 CFR § 404.1564).

8.      The claimant has transferable skills from past skilled work described in the body of the decision. (20 CFR § 404.1568).

9.      The claimant has a residual functional capacity for light work with limitations.

10.     The claimant's past relevant work as a dietician did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 404.1565).

11.     The claimant's impairments do not prevent the claimant from performing her past relevant work as a dietician.

12.     The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(e)).

13.     In addition, the claimant has a residual functional capacity to perform a significant range of light work. (20 CFR § 404. 1567).

14.     Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.22 as a

13

framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such job are the following: receptionist; telephone order clerk; and telemarketer.

15. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(e)).

(Tr. 28-29.)


# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C.A. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See,e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit

14

findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C.A. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the

15

combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can

Case 3:07-cv-00247   Document 16   Filed 08/10/09   Page 16 of 26 PageID #: 76

perform. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert.*

*denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the

medical-vocational guidelines "grid" as a means for the Commissioner of carrying his burden under

appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional

limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing

her past relevant work, if other work exists in the national economy that the plaintiff can perform,

she is not disabled.[8] *Id. See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29

(6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985);

*Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

    If the question of disability can be resolved at any point in the sequential evaluation process,

the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d

860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative

process is appropriate in some circumstances).


### B. The Five-Step Inquiry

    In this case, the ALJ resolved the plaintiff's case at step four of the five-step process. (Tr.

28.) At step one, the ALJ determined that the plaintiff had not engaged in substantial gainful activity

since June 10, 2000, the alleged onset date of disability. *Id.* At step two, the ALJ found that the

plaintiff suffered from the severe impairments of fibromyalgia, osteoarthritis, and a depressive

disorder. *Id.* At step three, the ALJ determined that the plaintiff's impairments did not meet or

---

    [8] This latter factor is considered regardless of whether such work exists in the immediate area
in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would
be hired if she applied. *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. *Id.* At

step four, the ALJ found that the plaintiff could perform her past relevant work as a dietician. *Id.*

**C. The Plaintiff's Assertions of Error**

The plaintiff alleges that the ALJ erred in assessing the medical opinions of her treating

physician, Dr. Regina Gilliland, and contends that the ALJ incorrectly evaluated the credibility of

her allegation of disability.

### 1. The ALJ properly assessed the medical evidence of Dr. Gilliland, the plaintiff's treating physician.

The plaintiff was under the care of two main physicians, Dr. Gilliland, a specialist who

specifically treated the plaintiff for complaints of fibromyalgia beginning in January 2001, and

Dr. Sally Killian, who was the patient's primary care physician beginning in October 1999. (Tr. 385,

415.) Dr. Gilliland examined the plaintiff an additional nine times after her initial visit (Tr. 402-16,

460.), and Dr. Killian examined the plaintiff an additional ten times after her initial visit. (Tr. 357-

89, 426-37.) Given the number and regularity of examinations conducted by Dr. Gilliland and

Dr. Killian, both would be classified as treating sources under 20 C.F.R. § 404.1502.[9] The plaintiff

_____

[9] A treating source, defined by 20 C.F.R. § 404.1502, is

> your own physician, psychologist, or other acceptable medical source
> who provides you, or has provided you, with medical treatment or
> evaluation and who has, or has had, an ongoing treatment relationship
> with you. Generally, we will consider that you have an ongoing
> treatment relationship with an acceptable medical source when the
> medical evidence establishes that you see, or have seen, the source
> with a frequency consistent with accepted medical practice for the
> type of treatment and/or evaluation required for your medical
> condition(s).

Case 3:07-cv-00247   Document 16   Filed 08/10/09   Page 18 of 26 PageID #: 78

argues that the ALJ erred by failing to assign controlling weight to Dr. Gilliland's medical assessments regarding her capacity for employment. Docket Entry No. 14, at 3-4.

Treating physicians are "the medical professional most able to provide a detailed longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone." 20 C.F.R. § 404. 1527(d)(2). Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2).

The plaintiff argues that Dr. Gilliland's medical source statement should be given controlling weight because Dr. Gilliland was treating the plaintiff specifically for her "main impairment–fibromyalgia," whereas Dr. Killian treated the plaintiff's general health complaints and not specifically fibromyalgia. Docket Entry No. 14, at 9-10. Although the ALJ characterized Dr. Gilliland as a treating physician, he did not give controlling weight to the work restrictions that she prescribed for the plaintiff because her treatment notes and the record evidence did not support her findings. (Tr. 23-24.) The plaintiff reported to Dr. Gilliland that she was remaining active (Tr. 402-03, 408, 413) and "exercising consistently"(Tr. 409), and that her exercising was "going great." (Tr. 410.) Dr. Gilliland's treatment notes also primarily focused on the plaintiff's sleeplessness, diet, and depression. (Tr. 402-14.) Further, Dr. Gilliland's medical source statements were inconsistent with the findings provided by Dr. Killian, Dr. Doineau, Dr. Davis, Dr. Moore, and a DDS evaluator. (Tr. 326-40, 418-21, 437-40.) Dr. Gilliland's medical opinions did not deserve

19

controlling weight since her findings were not supported by her own treatment notes or substantial evidence in the record.

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in 20 C.F.R. 404.1527 . . . .*'" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original).  The ALJ must consider

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. Aug. 8, 2006)(quoting 20 C.F.R. § 404.1527(d)(2)-(6)).  The ALJ must also provide "good reasons" for the resulting weight given to the treating source.  Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)).  The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*

The ALJ focused on the factor of consistency in discounting the severe functional limitations Dr. Gilliland assigned to the plaintiff.  The ALJ specifically addressed the plaintiff's "normal" lab results, increase in traveling, and exercise routine. (Tr. 24.)  The plaintiff also alleges that the ALJ took "small quotes out of the treatment notes that tend to distort the overall tone of the treatment notes" and specifically referenced the ALJ's reasoning that the plaintiff must be able to sit for more than 20 minutes at a time if she were traveling between Tennessee and Florida. Docket Entry No. 14, 4-5.  While the 20 minute restriction Dr. Gilliland assigned the plaintiff was with respect to working

20

eight hours a day for five days a week (Tr. 461), it is not unreasonable for the ALJ to question what type of effect such a restriction would have on the plaintiff's travels between Florida and Tennessee. (Tr. 24.) Further, this was only one of several factors the ALJ considered in determining the amount of weight to give Dr. Gilliland's findings. *Id.* As previously mentioned, Dr. Gilliland's treatment notes revealed that the plaintiff remained active by "exercising consistently" (Tr. 402-03, 408, 409, 413) and Dr. Gilliland encouraged the plaintiff to continue exercising. (Tr. 408, 411.) The plaintiff also reported in an activities of daily living questionnaire that she is able to leave her home "approx 5-6 times per week," drive, go to the grocery store, attend church, and exercise at the YMCA. (Tr. 152-54.) The level of activity the plaintiff enjoyed does not correspond to the restrictions Dr. Gilliland assigned to the plaintiff.

Dr. Gilliland's medical evaluations were also inconsistent with the findings of the plaintiff's primary care treating physician, Dr. Killian. Dr. Gilliland determined that in an eight hour day the plaintiff could sit for one to two hours and only for 20 minutes at a time, and stand/walk for one to two hours and only for 10 to 20 minutes at a time. (Tr. 461.) She opined that plaintiff could lift/carry up to 20 pounds infrequently and up to five pounds occasionally, but should never lift/carry anything over 20 pounds. *Id.* Dr. Gilliland concluded that the plaintiff required 10 to 40 minutes of bed rest twice a day during a normal workday, had reasonable subjective complaints of pain, and suffered from severe pain. (Tr. 462.) Dr. Gilliland also opined that the plaintiff could occasionally bend at her waist and infrequently reach above her shoulders and use her hand for fine manipulation, but should never stand on a hard surface. (Tr. 405.) Dr. Killian, however, determined that the plaintiff could lift/carry 50 pounds occasionally and 20 pounds frequently, could stand or walk at least two hours in an eight hour workday, and could sit about six hours in an eight hour workday.

21

(Tr. 437-38.)  She also indicated that "[e]xtreme cold will exacerbate [the plaintiff's] muscle pain and stiffness."[10] (Tr. 440.)

Given that both Dr. Gilliland and Dr. Killian are treating physicians and assigned different restrictions to the plaintiff, the ALJ had a difficult decision to make in determining which physician's findings should be afforded more weight.  The ALJ correctly assigned more weight to Dr. Killian's  assigned limitations because her medical reports more closely aligned with the plaintiff's level of activity (Tr. 23-24) and were consistent with the findings provided by Dr. Doineau, Dr. Davis, Dr. Moore, and a consultative DDS physician. (Tr. 326-40, 418-21, 437-40.) Further, Dr. Killian was aware of the plaintiff's fibromyalgia when she completed her medical source statement on the plaintiff. (Tr. 434.) Thus, the ALJ did not err in affording little weight to Dr. Gilliland's medical opinions since her findings were not supported by her own treatment notes, the medical findings of a treating physician and several consulting physicians, or the plaintiff's daily activities.

### 2. The ALJ did not err in assessing plaintiff's credibility regarding her allegation of disability.

The plaintiff alleges that the ALJ erred in evaluating her credibility by "punish[ing]" her for following exercise programs that were recommended by her physicians. Docket Entry No. 14, at 11-12.  The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision as to credibility rests with the ALJ.  The ALJ's credibility finding is entitled to

---

[10] Because Dr. Killian completed a Medical Source Statement and Dr. Gilliland completed Medical Opinion Forms, the information provided in those forms is slightly different so an item-by-item comparison is impossible.

Case 3:07-cv-00247   Document 16   Filed 08/10/09   Page 22 of 26 PageID #: 82

deference "because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *See Buxton v. Halter*, 246 F. 3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F. 3d at 1036). Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186 at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at 5. The ALJ must explain his credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. *Id.*

Both the Social Security Administration (SSA) and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. *See* 20 C.F.R. § 404.1529; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit in *Duncan v. Secretary of Health and Human Servs.*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[11] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039. The second prong has two parts: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition, or (2) whether the objectively established medical condition is of such a severity that

---

[11] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n.2.

23

it can reasonably be expected to produce the alleged disabling pain. *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

There is objective medical evidence of underlying physical medical conditions: the plaintiff has been diagnosed with fibromyalgia and osteoarthritis. This objective medical evidence satisfies the first prong of the *Duncan* test. Given that the second prong of the *Duncan* test consists of two alternatives, the plaintiff must only meet one of the following two elements: the objective medical evidence "confirms the severity of the alleged pain arising from the condition" or the "objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." The SSA provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. § 404.1529(c). The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence, or intensity of her pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2). Besides reviewing medical records to address the credibility of a plaintiff's symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. § 404.1529(c)(3).[12]

The ALJ determined that the plaintiff's level of activity was inconsistent with her alleged disability. (Tr. 24.) He relied on the treatment notes of Dr. Killian and Dr. Gilliland, indicating that

---

[12] The seven factors under 20 C.F.R. § 404.1529(c)(3) include: (i) the plaintiff's daily activities, (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms, (iii) precipitating and aggravating factors, (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms, (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on his back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.), and (vii) other factors concerning plaintiff's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

Case 3:07-cv-00247   Document 16   Filed 08/10/09   Page 24 of 26 PageID #: 84

the plaintiff was volunteering for the YMCA, exercising multiple times per week, and traveling between Florida and Tennessee (Tr. 24-25), and on Dr. Doineau's psychological evaluation, noting that

> [a]bout 3 or 4 times per week she goes to the Y for exercise. She attends her Circle group once per month and church twice per month. She does most of her own grocery shopping. She can drive herself to appointments. She usually goes out and does something about 5 days per week. She makes minor decisions but consults with her husband on major ones. She makes an effort to socialize.

(Tr. 332-33.) Although the plaintiff argues that the ALJ "punished" her for complying with her physicians' suggested treatment of exercise, under 20 C.F.R. § 404.1529(c)(3) her weekly exercise routine could have been characterized as a daily activity; "treatment, other than medication" prescribed by her physicians to relieve her pain or other symptoms; or a measure that she used to relieve pain. In considering the plaintiff's weekly exercise schedule, the ALJ was simply following 20 C.F.R. § 404.1529(c)(3). Additionally, in making his credibility determination, the ALJ did not solely rely on the plaintiff's ability to exercise or travel. Rather, the ALJ specifically cited treatment notes, examination records, medical source opinions, and the plaintiff's own reports of her activities of daily living. (Tr. 22-25.)

The ALJ properly weighed the evidence in the record and did not err in determining that the plaintiff's allegations of disability were not credible. The plaintiff's ability to exercise and travel were two of several factors considered by the ALJ in making his final determination, but were not the sole basis for that determination. Thus, there is substantial evidence in the record to support the ALJ's finding that the plaintiff is able to perform her past relevant work as a dietician.

Case 3:07-cv-00247   Document 16   Filed 08/10/09   Page 25 of 26 PageID #: 85

## V.  RECOMMENDATION

For the above stated reasons it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 13) be DENIED and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made.  Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge